Counsel, you may proceed. Edie Cunningham from the Federal Defender's Office on behalf of Mr. Romo-Chavez. Mr. Romo-Chavez's conviction should be reversed for two reasons, both of which directly impacted the jury's assessment of his credibility and both of which could have been avoided simply by sound law enforcement practices. First, the district court erroneously denied an adverse inference instruction based on its misunderstanding that bad faith was necessary for that. And second, the district court did not correctly apply the rule of Nazamian, which requires a case-by-case evaluation of the totality of the circumstances when determining whether to admit a translated statement as the admission of the defendant. Instead, the district court narrowly applied only the four factors specifically addressed in Nazamian, even though the district court had clear concerns about other relevant factors, including the lack of tape recording, the agent's marginal translation skills, his complete lack of memory as to the substance of the translation, and his antagonistic position vis-a-vis Mr. Romo-Chavez because he was acting as a law enforcement agent in that case and had an inherent bias. The district court did not recognize the extent of its discretion, did not acknowledge that Nazamian was a plain error case, whereas here the government wore the burden to show that the statement was admissible as an admission by the defendant. And in any event, none of the factors addressed in Nazamian weigh in favor of admission. Instead, this case is much more like Martinez-Gaetan, where the defendant did not understand English like Mr. Romo-Chavez and therefore could not verify the accuracy of what the translator was doing. Two, he challenged the accuracy of the translation at trial and said he said something different. He didn't adopt the statement or sign it like the defendant in Martinez-Gaetan. And as in Martinez-Gaetan, the translator could not be cross-examined on the subtleties and shades of meaning in the translation because he had absolutely no memory of the substance of that translation. And for that reason you submitted a 28-J letter, which has at least two Confrontation Clause cases, but I don't seem to be arguing here a Confrontation Clause issue as such. Is that right? Yes, Your Honor. We also argue the Confrontation Clause was violated. You have the United States v. Owens problem. I mean, this man was cross-examined at great length. The problem was he didn't remember much. Well, in Owens, the declarant did remember making the statement. He just didn't remember the basis for making the statement. So he could be very effectively cross-examined on the statement. Here, the agent did not remember the substance of the translation at all. He could not defend or explain the statement as indicated. But he did remember that he had translated it and he remembered in general how he translated it. Well, he was mainly remembering his usual practice. I would say that the — I believe it was the Miranda waiver of rights reminded him that he actually did do the statement. But if you read the testimony, he's really thinking back to his usual practice. But that doesn't change the fact that he could not be cross-examined on the statement itself because he did not remember anything about it. And our contention is that that does create a confrontation problem. It's an open question, as Goforth, the Mississippi case, and Cookson make clear. Well, Cookson doesn't. I mean, Cookson, in fact, is to the contrary, as I read Cookson. It seems to be exactly to the contrary. Well, actually, Cookson is not contrary because it does say that it is possible to have a confrontation violation even if the witness appears in court. In Cookson, the witness appeared. She didn't remember the statement, but she remembered the underlying events and could be cross-examined on that. And could be cross-examined on the fact that her testimony as to those events was inconsistent with the subsequent statement that she gave. So there was a lot more memory there, and she could be cross-examined on the events and the statement. Here, Agent Hernandez had no recollection of the substance of the statement, so there was no opportunity to cross-examine on the shades of meaning. And we contend that that is a confrontation violation, but even if it's not, it certainly shows that this is not reliable enough hearsay to deem an admission of the defendant. There's no way to challenge it. There's no way to confirm its accuracy. What is your understanding of Nazemian sort of mushes together an agency theory and a, quote, language conduit theory? And I gather there's agreement, or at least it seems pretty obvious, that there was no agent here. So the question is, what is this – is there a separate language conduit theory that's independent of the agency theory, and where does it come from? Your Honor, I don't think it's a separate theory. I think it's just an attempt to extend the agency theory. It doesn't make a whole lot of sense to me, but it is – it does hinge on reliability of the statement, which is why Nazemian is clearly not still good law after Crawford. Well, but the problem is that Nazemian treats the – this question of whose statement it is as logically prior to the confrontation clause issue. And so the real question for me is, if I thought there was a problem there and if I thought this case raised it, could we, as a three-judge panel, deal with that, given the fact that Nazemian, at least in form, is not about whether there was a confrontation-clause violation, but what – but whose statement this was? Well, Your Honor, I think you could address it, because Nazemian, if you take the four factors that it considers, specifically, they all have to do with reliability except the first one that has to do with agency. And it's Scythe, Ohio v. Roberts. But it's for the purpose of determining at least the way this opinion was structured, whose statement is this, not is this a testimonial statement or is this reliable as hearsay or anything like that. It was structured so that it was a logically prior question. Yes, Your Honor. Yes, Your Honor. I agree it's very confused, but I do think you can get there, because I think Crawford definitely undermines the viability of it. I would like to see some of the other questions. Definitely undermines what? The viability of Nazemian. I know, but I'd like to know why. That's what I'm trying to understand. Why to the degree – undermine is one thing, but to the degree that under Miller v. Gammey, a third – a three-judge panel of this Court could ignore Nazemian or reverse it? Nazemian is about reliability. It relies on Ohio v. Roberts, which has been overruled. It doesn't rely on it. That's the problem. It seems to me to be – to say we don't have to get to the Roberts question. I think that it is relying on it, and I've answered it to the best of my ability. So I'd like to address some of the other issues in the case. All of the factors here weigh against admission of the statement. Even if it's not a confrontation violation, it certainly is not reliable enough to be admitted as the admission of the defendant. The government supplied the interpreter. The interpreter was a law enforcement agent who had an antagonistic position, as the district court found. He acted as a law enforcement agent. He administered Miranda warnings. He actually assisted major – Kennedy, it's no showing of bias, was there? He may have been obviously in a law enforcement mode, but that doesn't mean he's biased, does it? Well, the district court found he had an inherent bias, and there may not have been direct evidence of a motive to mislead, but this is certainly a favor – a factor that weighs against admission of the statement. But the problem with him is that his Spanish was not so hot. And his Spanish was terrible, and I would like to address that. The district court found twice that he was marginally competent. Marginal implies that someone is going to make a lot of mistakes. We would not – But, counsel, we are in a black and white world here. I mean, I just had an evaluation on a defendant that he's marginally competent to stand trial. Does that mean I can't try him or I can try him? It means I can try him. Competent is the key word here, not marginal. But – and you have a trial judge, you know, in Judge Zapata, who's a native Spanish speaker, heard what was going on. When he says marginally competent, he means competent. And when the agent couldn't translate a certain legal document, he – the trial judge said, I couldn't do it either, even though I'm a native Spanish speaker. So marginal here doesn't mean he's going to make mistakes. And if you start out with the prospect that every law enforcement officer is biased, we shouldn't allow any confessions into evidence, because what could stop somebody from making up the confession? May I respond? Sure. We're talking about an evaluation of the totality of the circumstances here. This – his qualifications do not weigh in favor of admission. He admitted he was not fluent. He admitted he didn't understand verb tense. He admitted he made mistakes and needed help. These are the kinds of things that really could have made a difference, because the prosecutor, in particular, pointed out very subtle inconsistencies in the statements when arguing to the jury. For example, she said, well, Mr. Romachavez changed his story and said he was going to the Tucson Dillards instead of Phoenix. Verb tense could make a lot of difference there. I was going to Tucson. Well, I would have gone to Tucson if I hadn't had other business in Phoenix. So that is – that is the problem here. In all of the other cases – excuse me? Did you do the trial yourself? No, Your Honor. That's too bad, because you're good. All of the other cases that I've seen, except for Martinez-Gayetan, there has been complete fluency. There's been no question about fluency. Here, there obviously wasn't fluency. Also, it couldn't be verified because he didn't remember the statement. And Mr. Romachavez challenged the accuracy of the statement at trial. That's another way this case differs from the other cases, except for Martinez-Gayetan. In all of the other cases, there was not a challenge to the accuracy. Isn't it – I mean, except for this Owens problem and your argument that it doesn't apply, what actually went on here was the equivalent of what would have gone on in a Confrontation Clause situation if we thought the Confrontation Clause applied. And if we thought the Confrontation Clause applied, then we wouldn't be doing a Nazemian thing, right? We would just be laying – put them on, cross-examine them, right? Yes, Your Honor. So therefore, if – I mean, the question then becomes why, if Nazemian doesn't live, then what does live is probably less to your advantage. No, Your Honor, because it's still hearsay. The prosecution would have to cross not just the Confrontation hurdle, but the hearsay hurdle. And the Nazemian factors are relevant to the hearsay hurdle. Reliability is relevant to the hearsay hurdle. And I don't believe that the prosecution did not meet that burden. And the final thing, it wasn't tape recorded. The law clearly allows the Court to consider whether or not it's tape recorded in deciding whether to admit it. The record makes clear the judge did not understand that. And I would like to reserve the rest of my time. You may do so, counsel. We'll hear from the government. Thank you, Your Honor. May it please the Court, my name is Bruce Fergus, Assistant United States Attorney on behalf of the government in this case. Basically, what we have is two situations in which the district court appropriately exercised its discretion, and that's the standard, abusive discretion, to admit evidence or to deny an instruction based on very clear precedence from this court, which the defense has not shown any basis for this court to say that there's intervening law that allows it to deviate. Now, specifically, since the main concern seems to be the translation issue and confrontation, Nazemian is very clear that it is doing a threshold analysis. It's saying we don't have to get into either hearsay or confrontation clause analysis depending on who the declarant actually is. But, you know, in Bullcoming, I think it was Bullcoming, a somewhat similar argument was made by the government. Essentially, it's the machine that's testifying, not the person. And the Court said, no, no, no, you can't do that. And I'm wondering why this isn't the same. Well, I really don't think that there's a meaningful analogy there, because what we're talking about here. Well, it seems more accurate. I mean, the machine is going to be more accurate than a translation. Translations are – I mean, I've had, you know, I had another couple cases with the same issue, and I observed then and I observe now that there are probably five translations of war and peace, and they don't bear a lot of resemblance to each other. So there are massive differences in translations. Well, there's a significant question about whether the Crawford analysis would even apply here, because Crawford made clear that even when it was going through this whole analysis of what is testimonial and so forth, it was not affecting those understandings of confrontation that were prevalent at the time that the Sixth Amendment was adopted, i.e., the common law. I'm sorry, I didn't hear that. The understandings of confrontation that were prevalent at the time of the founding and were incorporating the common law, including its exceptions, into the Sixth Amendment, and Crawford itself specifically talks about the fact that what was prohibited and prevented by the Sixth Amendment in the Confrontation Clause was somebody else's admissions being allowed in against the defendant, as opposed to the defendant himself. Isn't it true that – because I've been thinking about this – that you certainly can confront the agent who comes in to testify as to what you said. Yes. Because that person is – is testifying to something, i.e., what you said. So, therefore, that doesn't help anything. It doesn't help the analysis at all, unless you do this leap and say, well, the translator sort of isn't there. He's just a telephone wire. And that's – and that does seem to be what Nazemian may be saying with a very set of standards to decide whether he's a telephone wire, but it belies the truth. He's not a telephone wire. Well, that's why Nazemian says you have to analyze these factors to determine whether you're going to treat him as a telephone wire or a conduit. But that is all preliminary, and if you find that, in fact, Nazemian and its factors and its general – Here we have a person who at least was a pretty staticky telephone wire, in the sense that he – his Spanish was – may be found to be marginally competent, but fairly lousy. I think perhaps defense counsel has kind of overstated or misunderstood some of the district court's findings, because the district court looked at the four Nazemian factors and said, okay, who provided them? Obviously, the government. But he had no prior connection with the case. He's simply a guy who was available. That's not the problem. I mean, I thought the frauds examination was actually pretty effective, and that was – the frauds examination was pretty effective, but it seemed to demonstrate the difference between his translations and the official court reporter's translations were extraordinary, of things that were put to him, and not just this very technical leak. The district court found to the contrary. He said he's marginally competent, but only because he's not qualified or equipped to report or repeat, I should say, the Miranda warnings from memory, which he had never been required to do, which was one of the unfair tests, nor was he equipped to translate a, in effect, commercial contract, which Judge Zapata himself said he could not have translated from Spanish into English. So when he said marginally competent, he nonetheless said he is sufficiently competent to deal with the relatively simple questions that were being asked in this case. Where did you come from? Where do you live? What is your – when did you buy the car? Which is essentially the same kind of questions he was asking in 2,000 interviews that he had done in the passport section. So to say that his Spanish was terrible is simply wrong. He, when – and the question of fluency, he said, I consider myself fluent to do the things that I need to do. He admitted, I don't speak scientific Spanish or legal Spanish, but he said, I'm fluent to deal with the kind of people that I'm dealing with. And that's essentially what the district court found. So there's not a real meaningful question about the qualifications. This is not rocket science or calculus that he was being asked to translate. It was very simple questions, the kind that he was used to doing. Secondly, although the district court talked in terms of in his position, he might be thought to have a bias, the district court specifically found that there was no evidence presented of actual bias or prejudice or distortion. Now, these are findings that are reviewable only for clear error, and they were not clearly erroneous. So all of the factors that the district court looked at under Nazemian are essentially factual. District court looked at everything that was presented and said, this is a sufficiently competent conduit. Maybe there's some static, but there's enough for it to be a reasonably accurate transmission from the defendant. And therefore, you don't even get to hear, say, or confrontation, because he's not allowed to confront himself. It's an admission. He's not hearsay, because admissions by a defendant are defined as not even being hearsay. And that's essentially the reformulation of the common law. So if Nazemian was applied properly here, and it was, and it is the law, and it is because there's been no intervening law to change it, and Crawford doesn't address this kind of a situation, then it's I mean, wouldn't you say that there's at least some tension between Nazemian and the Crawford line of cases, because it is an inquiry into reliability rather than It may be that it's not sufficient tension to allow a three-judge court to overrule it, but there's certainly some tension, isn't there? A minimal, I would say, because, again, as I understand what the Court was doing in Nazemian is saying, here's how we set the situation up. Here's how we set the table to find out if we even have to get to confrontation. And although reliability is part of that, as was discussed in some of the prior arguments, reliability is, in fact, something that can be to some degree considered even after Crawford. But you don't have to get to that, because even under Crawford it says we're looking at the Sixth Amendment and the common law as it existed at the time of the founders. Kagan. What about this question of whether the district court should have and could have considered the lack of a recording? I mean, sure, it would help an awful lot in all these situations if there was an available recording of the spanner so that an actual court-certified translator, and again, you can see the difference, could translate it. Well, could have or should have basically goes to the weight. It's not to the admissibility, because there are other things that go to the weight. But you agree that it does go to the weight. Logically, I don't think that it does, honestly, and I'll tell you why. Because if you have a recording that shows this is what was said, that's helpful in determining whether, in fact, what was reported as being translated is accurate. But if you don't have a report, excuse me, if you don't have a recording, that doesn't tell you anything about the accuracy of the report that you do have. It's basically nothing. It doesn't tell you anything because you don't have it. And so unless there is a rule or a requirement or there is some evidence, which basically goes to bias, showing that the government was attempting to evade having an accurate report, then it's got no logical connection, no probative value. Wasn't this at a border checkpoint, so it's not likely that there would be those kinds of facilities? Those kinds of what? Facilities. As far as recording? Yeah. Well, again, because there was no legal requirement and no regulation telling them to do that, they simply did not make provision. I mean, let's face it, federal law enforcement doesn't tape anything. And I think that's nonsense and crazy, but that's FBI policy and been adopted by the, I wish you guys would work on them a little bit because it really would solve a lot of problems and it would make them look better, not worse. But they seem to dig their heels in and not record anything. I understand that's been discussed at higher paid grades than mine and without success, but I would agree, that would be helpful, but it doesn't really go to the probative value in this case of what was admitted. Anything further, counsel? Not on that. Does the Court have any questions on the other argument about the supposedly lost evidence? No questions, apparently. Thank you very much, counsel. We'll hear from the, for the rebuttal, from Ms. Cunningham. And, Ms. Cunningham, I wasn't patronizing you when I said you were good. I'm saying your cross-examination of the agent making all those points would have raised, in my mind, a serious doubt about the accuracy of the translation. But isn't that what trials are for and what juries are for? Your Honor, in order to admit that evidence, as it's admissioned by the defendant, which is some of the most incriminating evidence that can be admitted by the defendant, there needs to be a minimum threshold of reliability. That's what the hearsay rules are all about. It wasn't met here for the reasons I explained before. And I would like to briefly address the other issue, because I think it's very important. It's clear that an adverse inference instruction was warranted because the government destroyed evidence it knew was potentially relevant or should have known was potentially relevant. But what was the showing that this destroyed property would have been exculpatory? That is not necessary. It only has to be potentially exculpatory or potentially relevant. And here the prosecutor, again, specifically argued that Mr. Romo-Chavez had no indication that he had had a recent contact with Ms. Torres and that he would really had a meeting with her in Phoenix. He testified that, yes. Scalia, was there any showing of bad faith? That is not necessary. And I realize that there are two conclusory statements in Artero and Janel, but those are clearly not something this Court has to follow because of Youngblood. Janel predates Youngblood. Artero postdates Youngblood. Youngblood makes clear that bad faith is necessary for a due process violation giving rise to dismissal or suppression of secondary evidence. Youngblood had an adverse inference instruction. That was one reason Justice Stevens said the prejudice was ameliorated. Kagan. The problem is that an adverse inference instruction is about bad faith. You're going to infer that the material would have been helpful, presumably, because that's why it was destroyed. I mean, I can imagine some other kind of instruction that isn't exactly an adverse inference instruction. I encourage you to look at this Court's cases in Glover and Akeona, which say that that's not why you give an adverse inference instruction, or at least that's not the only reason. You give it for deterrent, to make sure that the party isn't negligent in destroying evidence. And here, there's a clear lack of communication between the two. You're telling the jury there's something that isn't so, i.e., that there's a reason to think that this was done to destroy, because it was against the government's interest, even though that isn't necessarily true? It's a deterrent rationale, and I encourage you to read this Court's opinion in Glover and Akeona. And this is very important, because the U.S. Attorney's Office is imputed. All the knowledge and access of the Customs Agency is imputed to them. But what's the floor problem here is that apparently they tried to give the material back, and nobody got it. And they gave them plenty of time and several notices, and it doesn't happen. Your Honor, Mr. Romo-Chavez was never notified that it was going to be destroyed. He wasn't in a position to pick it up. If his attorney had picked it up. Didn't it say you have to pick it up with some amount of time? It said we're not sure that he got that receipt. We do know that he had some notice that the property were there. It could be that the agents just told him about that. But that doesn't change the fact that the prosecutor had a duty to disclose this evidence under Rule 16 and therefore had a duty to preserve it. Thank you, counsel. The case just argued will be submitted for decision, and we will hear argument in the last case for this session, which will be United States v. Laban.
judges: Lasnik, O'scannlain, Berzon